UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                     Plaintiff,                     Civil No.

vs.                                        Honorable

$67,344.93 remitted to the United States Marshals
Service from Chase Account ending in 0852;
$54,499.93 remitted to the United States Marshals
Service from Chase Account ending in 7885;
$102,000.00 remitted to the United States Marshals
Service from Chase Account ending in 0811;    **Complaint for Forfeiture**
$13,234.43 remitted to the United States Marshals
Service from Chase Account ending in 6185;
$18,608.89 remitted to the United States Marshals
Service from Chase Account ending in 7935;
$285,000 remitted to the United States Marshals
Service from Chase Account ending in 7893;
All funds on deposit in Horizon Bank Account
ending in 4233, not to exceed $392,663.25;
$200,000.00 remitted to the United States Marshals
Service by check from Chadwell Legal Services;
$80,000.00 remitted to the United States Marshals
Service by Prasad Legal PLLC; and $30,000.00
remitted to the United States Marshals Service
by check from Move Your Feet.

                    Defendants *in Rem.*
_____/

## COMPLAINT FOR FORFEITURE

NOW COMES Plaintiff, the United States of America, by and through

DAWN N. ISON, United States Attorney for the Eastern District of Michigan, and

1

K. Craig Welkener, Assistant United States Attorney, and for its Complaint for

Forfeiture states:

## JURISDICTION AND VENUE

1.      This is an *in rem* civil forfeiture action pursuant to 18 U.S.C. § 981

and related statutes.

2.      This Court has original jurisdiction over this proceeding pursuant to

28 U.S.C. § 1345 because this action is being commenced by the United States of

America as Plaintiff.

3.      This Court has jurisdiction over this forfeiture action pursuant to 28

U.S.C. § 1355 (b)(1)(A) because the acts giving rise to the forfeiture occurred in

the Eastern District of Michigan.

4.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to the Plaintiff's

claims occurred in the Eastern District of Michigan.

5.      Venue is also proper before this Court pursuant to 28 U.S.C.

§ 1395(a), (b), and (c) because the action accrued and the Defendants in rem were

found, seized, and/or remai in the Eastern District of Michigan.

6.      The defendants in rem include:

   a.  $67,344.93 remitted to the United States Marshals Service from

       Chase Account ending in 0852;

2

b. $54,499.93 remitted to the United States Marshals Service from Chase Account ending in 7885;

c. $102,000.00 remitted to the United States Marshals Service from Chase Account ending in 0811;

d. $13,234.43 remitted to the United States Marshals Service from Chase Account ending in 6185;

e. $18,608.89 remitted to the United States Marshals Service from Chase Account ending in 7935;

f. $285,000 remitted to the United States Marshals Service from Chase Account ending in 7893;

g. All funds on deposit in Horizon Bank Account ending in 4233, not to exceed $392,663.25;

h. $200,000.00 remitted to the United States Marshals Service by check from Chadwell Legal Services;

i. $80,000.00 remitted to the United States Marshals Service by Prasad Legal PLLC; and

j. $30,000.00 remitted to the United States Marshals Service by check from Move Your Feet.

## BACKGROUND INFORMATION

7.     The Defendants *in rem* are the proceeds of illegal activity or property traceable to proceeds of illegal activity, specifically Health Care Fraud in violation of 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349, Conspiracy to Pay and Receive Kickbacks in violation of 18 U.S.C. § 371, Payment of Kickbacks and Bribes in Connection with a Federal Health Care Program in violation of 42 U.S.C. §§ 1320a-7b(b)(2)(A), Engaging in Monetary Transactions Exceeding $10,000 in Criminally Derived Property in violation of 18 U.S.C. § 1957, and Laundering of Monetary Instruments in violation of 18 U.S.C. 1956(a)(1). Defendants *in rem* are therefore subject to civil forfeiture to the United States pursuant to 18 USC § 981(a)(1)(C).

8.     The Defendants *in rem* are also subject to forfeiture as property involved in money laundering, specifically Engaging in Monetary Transactions Exceeding $10,000 in Criminally Derived Property in violation of 18 U.S.C. § 1957, and Laundering of Monetary Instruments in violation of 18 U.S.C. 1956(a)(1).  Defendants *in rem* are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## COMPANION CRIMINAL CASES

9.     There is one companion criminal case in the Eastern District of Michigan related to this case: *United States v. D-1 Mohamed Kazkaz*, *et al,* Case

No. 23-cr-20022, Drain, J.  References to "Counts" below therefore refer to Counts 1-10 as alleged in the Second Superseding Indictment of that criminal case.

## UNDERLYING CRIMINAL ACTIVITY

### The Medicare Program

10.    The Medicare program was a federal health care program providing benefits to persons who were 65 or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

11.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

12.    Medicare included coverage under two primary components, hospital insurance ("Part A") and medical insurance ("Part B").  Medicare Part B covered the costs of medical insurance, including physician, nursing, and other ancillary services not covered by Part A.  The services at issue in this Information were covered by Part B.

13.    CoventBridge Group was the Zone Program Integrity Contractor ("ZPIC"), and as such, it was the Medicare contractor charged with investigating fraud, waste, and abuse, during the relevant time period.

5

14.    To participate in Medicare, providers were required to submit applications in which the providers agreed to comply with all Medicare-related policies and procedures, rules, and regulations issued by CMS and its agents and contractors, including those governing reimbursement, and furthermore, certified that they would not knowingly present, or cause to be presented, false and fraudulent claims.

15.    If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for the processing and payment of claims.

16.    Local Coverage Determinations ("LCDs"), as defined by the Social Security Act, were decisions made by a Medicare Administrative Contractor ("MAC") on whether a particular service or item was reasonable and necessary, and therefore covered by Medicare within the specific region that the MAC oversaw. LCDs 34616 and 30489 were titled "Psychiatry and Psychological Services" and applied to the primary geographical jurisdiction of Michigan.  These LCDs specified that Medicare coverage of psychotherapy did not include teaching grooming skills, monitoring activities of daily living ("ADL"), recreational therapy (dance, art, play), or social interaction. It also did not include oversight activities such as house or financial management. LCD A54829, entitled "Clinical Social Worker Services,"

stated that services furnished as an "incident to" clinical social work ("CSW") personal professional services were not covered.

17.     Providers were given, and provided with online access to, Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations. Providers could only submit claims to Medicare for services they rendered, and providers were required to maintain patient records to verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

18.     To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (e.g., a CMS-1500 form or UB-92), to the Medicare contractor or carrier containing the required information appropriately identifying the provider, beneficiary, and services rendered.

19.     Medicare only covered services that were both medically necessary and rendered as billed.

**Federal Anti-Kickback Statute Compliance**

11.     As a requirement to enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that a payment

7

of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare would not pay claims procured through kickbacks and bribes.

## The Related Business

12. Centre was a Michigan corporation doing business at 34600 West Twelve Mile Road, Farmington Hills, 48331. Centre was enrolled as a participating Medicare provider and submitted claims to Medicare. Centre was a psychotherapy agency that purportedly provided individual and group psychotherapy sessions to patients.

## The Defendants and Related Entities

13. MOHAMED KAZKAZ was a resident of Oakland County, Michigan. KAZKAZ was the controller, operator, resident agent of Centre. KAZKAZ was the sole signatory on the bank accounts into which Medicare reimbursements to Centre was deposited.

14. ZIAD KHALEL, was a resident of Oakland County, Michigan, and was a patient recruiter for Centre. KHALEL was the controller, operator, and resident agent of URUK, a limited liability company, registered in the State of Michigan. KHALEL was also the controller, operator, and resident agent of IPACK, a limited liability company, registered in the State of Michigan.

8

15.　MUSTAFA ABDUL-KARIM HARES, M.D., was a resident of Oakland County, Michigan, and is a Medical Doctor licensed in the State of Michigan. MUSTAFA ABDUL-KARIM HARES, M.D., was employed as a physician at Centre and was enrolled as a participating provider with Medicare and Medicaid.

16.　GAMELA ALI, was a resident of Wayne County, Michigan. ALI was employed as the office manager of Centre. ALI was responsible for obtaining information regarding the patients legitimate medical visits and or treatments to ensure KAZKAZ did not bill for a psychotherapy appointment on the same date the patient had a legitimate appointment with another medical provider.

17.　GERALDINE LETMAN, was a resident of Phoenix, Arizona, is a licensed social worker in the State of Michigan.  GERALDINE LETMAN was employed as a social worker at Centre and was enrolled as a participating provider with Medicare and Medicaid.

18.　Individual A was a resident of Oakland County, Michigan, and operated a home health agency in Dearborn, Michigan, that purportedly provided in-home physical therapy, occupational therapy, and skilled nursing services to patients.

**Count 1 Allegations**
**Conspiracy to Commit Health Care Fraud**
**(18 U.S.C. § 1349)**

9

19.    From in or around January 2018 and continuing through in or around January 2023, in Oakland Counties, in the Eastern District of Michigan, and elsewhere, MOHAMED KAZKAZ, ZIAD KHALEL, MUSTAFA ABDUL-KARIM HARES, M.D., GAMELA ALI, GERALDINE LETMAN, and others, did willfully and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a. to violate Title 18, United States Code, Section 1347, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services; and

b.  to violate Title 18, United States Code, Section 1343, that is, to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and

fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

### Purpose of the Conspiracy

20.     It was the purpose of the scheme and artifice for the defendants to unjustly enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare for services that were medically unnecessary and not eligible for reimbursement; (b) offering, paying, soliciting, and receiving kickbacks and bribes for the purpose of arranging for the use of Medicare beneficiary information as the bases of claims submitted for psychotherapy services; (c) concealing the submission of false and fraudulent claims to Medicare, and the receipt and transfer of the proceeds of the fraud; and (d) diverting proceeds of the fraud for their personal use and benefit.

### The Manner and Means of the Conspiracy

21.     The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among other things:

22.     MOHAMED KAZKAZ certified to Medicare that he would comply with all Medicare rules and regulations, and federal laws, including that he would not knowingly present or cause to be presented a false and fraudulent claim for

payment by Medicare and that he would refrain from violating the Anti-Kickback Statute.

23.     MOHAMED KAZKAZ owned and controlled a psychotherapy agency, Centre, for the purpose of submitting false and fraudulent claims to Medicare seeking reimbursement for psychotherapy services that were not provided or were otherwise not eligible for reimbursement and whose Medicare identification numbers were procured through kickback and bribes.

24.     MOHAMED KAZKAZ offered and provided kickbacks and bribes to ZIAD KHALEL, and others, as an inducement to refer Medicare beneficiaries to Centre for psychotherapy services, even though such services were medically unnecessary and were never rendered.

25.     Some of the Medicare beneficiaries referred to KAZKAZ by KHALEL were patients of Individual A's home health agency and were not, in fact, in need of psychotherapy services. KHALEL would require the recruited Medicare beneficiaries to sign blank Centre sign-in sheets to allow KAZKAZ to submit claims to Medicare, through Centre, for psychotherapy services that were never rendered.

26.     ALI, as the office manager of Centre was responsible for obtaining information regarding the patients legitimate medical visits and or treatments to ensure KAZKAZ did not submit claims for a psychotherapy appointment on the same date the patient had a legitimate appointment with another medical provider.

27.     KAZKAZ, KHALEL, HARES, LETMAN and others submitted and caused Centre to submit false and fraudulent claims, through interstate wires, to Medicare for psychotherapy services purportedly rendered to Medicare beneficiaries, when in truth and in fact, such psychotherapy services were never rendered, were not medically necessary, and were not eligible for Medicare reimbursement.  As a result of these false and fraudulent claims submitted to Medicare through interstate wires, Centre billed Medicare more than $11 million dollars and Medicare made payments to Centre in an amount more than $5.3 million dollars.

All in violation of Title 18, United States Code, Sections 1347 and 1349.

## <u>Count 2</u>
### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

28.     From at least in or around January 2018, and continuing through in or around January 2023, the exact dates being unknown, in Oakland and Wayne Counties, in the Eastern District of Michigan, and elsewhere, MOHAMED KAZKAZ and ZIAD KHALEL did willfully and knowingly conspire and agree with each other and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is,

    a.  to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration

(including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare, a Federal health care program as defined in Title 18, United States Code, Section 24(b); and

b.  to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration (including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicare, a Federal health care program as defined in Title 18, United States Code, Section 24(b).

**Purpose of the Conspiracy**

29.   It was a purpose of the conspiracy for the defendant and his co-conspirators to unjustly enrich themselves by: (1) offering, paying, soliciting, and receiving kickbacks and bribes in return for Medicare beneficiary referrals; and (2) submitting and causing the submission of claims to Medicare for purported psychotherapy services provided to those recruited beneficiaries.

**Manner and Means of the Conspiracy**

30.   The manner and means by which the defendants and others sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

31.   MOHAMED KAZKAZ paid and caused the payment of illegal kickbacks and bribes to ZIAD KHALEL, and others in exchange for referring Medicare beneficiaries and providing Medicare beneficiary information that KAZKAZ used to support the submission of claims to Medicare, through Centre, for purported psychotherapy services.

32.   MOHAMED KAZKAZ, ZIAD KHALEL, and others disguised and concealed the kickbacks and bribes to KHALEL and others through KHALEL's company.

33.   MOHAMED KAZKAZ wrote checks to ZIAD KHALEL's company from bank accounts, including JP Morgan Chase Bank checking account ending in

15

x0690.  ZIAD KHALEL would in turn pay the recruited Medicare beneficiaries in cash and checks from his company with proceeds from the checks he received as compensation for recruiting and referring Medicare beneficiaries to Centre.

## Overt Acts

34.    In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the conspirators committed, or caused to be committed, in the Eastern District of Michigan, at least one of the following overt acts, among others:

35.    On August 3, 2018, MOHAMED KAZKAZ, paid and caused the payment of approximately $400.00 to ZIAD KHALEL in the form of check number 0117, drawn on JP Morgan Chase Bank checking account x0690, held in the name of Centre, made payable to KHALEL, in exchange for referring Medicare beneficiaries and providing Medicare beneficiary information.

36.    On February 10, 2022, MOHAMED KAZKAZ, paid and caused the payment of approximately $10,000 to ZIAD KHALEL in the form of check number 0697, drawn on JP Morgan Chase Checking Account x0690 held in the name of Centre, made payable to KHALEL's company, in exchange for referring Medicare beneficiaries and providing Medicare beneficiary information.

37.    On or about June 11, 2021, ZIAD KHALEL met with M.H. a recruited Medicare beneficiary, and requested M.H. sign blank Centre sign-in sheets.

16

38.   On June 29, 2021, MOHAMED KAZKAZ, paid and caused the payment of approximately $7,350.00 to ZIAD KHALEL in the form of check number 0291, drawn on JP Morgan Chase Bank checking account x0690, held in the name of Centre, made payable to KHALEL's company IPACK, in exchange for referring Medicare beneficiaries and providing Medicare beneficiary information.

39.   On or about November 15, 2021, ZIAD KHALEL met with N.M. a recruited Medicare beneficiary, and requested N.M. sign blank Centre sign-in sheets.

40.   On or about November 15, 2021, ZIAD KHALEL met with K.M. a recruited Medicare beneficiary, and requested K.M. sign blank Centre sign-in sheets.

41.   On November 3, 2021, ZIAD KHALEL, paid and caused the payment of approximately $100.00 to M.H. a recruited Medicare beneficiary in the form of check number 2081, drawn on Flagstar Bank Checking Account x3128, held in the name of IPACK, made payable to M.H. as compensation for signing blank Centre sign-in sheets.

All in violation of Title 18, United States Code, Section 371.

17

## Counts 3-4
### 42 U.S.C. § 1320a-7b(b)(2)(A)—Payment of Kickbacks and Bribes in Connection with a Federal Health Care Program

42.     On or about the dates set forth below, in Oakland County, in the Eastern District of Michigan, and elsewhere, MOHAMED KAZKAZ and ZIAD KHALEL, did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, as set forth below:

| Count | Approximate Date of Payment | Description | To | From | Approximate Amount |
|-------|-----------------------------|-------------|-----------|------------|--------------------|
| 3 | August 3, 2018 | Check | KHALEL | CENTRE HRW | $400.00 |
| 4 | February 10, 2022 | Check | IPACK LLC | CENTRE HRW | $10,000.00 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), and Title 18, United States Code, Section 2.

## Counts 5 - 10
### Engaging In Monetary Transactions Exceeding $10,000 in

## **Criminally Derived Property**

## **(18 USC § 1957)**

43.    On or about the dates set forth below, in the Eastern District of Michigan, and elsewhere, defendant MOHAMED KAZKAZ did knowingly engage or attempt to engage in the following monetary transactions, by and through a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the, transfer of funds, such property having been derived from a specified unlawful activity, specifically the conspiracies detailed above to commit health care fraud and to commit health care kickbacks:

| COUNT | DATE (On or about) | TRANSFER AMOUNT |
|---|---|---|
| 5 | January 25, 2022 | $70,000 to JP Morgan Chase Bank Account No. X609 held in the name of Kaz Kaz Art Gallery, LLC. (Online transaction number X278) |
| 6 | December 28, 2021 | $55,000 to JP Morgan Chase Bank Account No. X616 held in the name of Kaz Karing Homes, LLC. (Online transaction number X413) |
| 7 | January 18, 2023 | $779,000 in cashier's check to Mohamad Kazkaz from Centre Bank Account x690 |

| COUNT | DATE (On or about) | TRANSFER AMOUNT |
|---|---|---|
| 8 | January 18, 2023 | $500,000 in cashier's check to Mohamad Kazkaz from Centre Bank Account x732 |
| 9 | January 21, 2023 | $1,445,000 in cashier's check to National Restaurant Chain #1 remitted by Mohamad Kazkaz |
| 10 | January 30, 2023 | $280,000 in cashier's check to Mohamad Kazkaz from Centre Bank Account x690. |

## FINANCIAL TRACING INFORMATION

44.    The Defendants in rem listed in paragraph 6(a-g) above are all funds traceable to the Count 9 cashier's check to a National Restaurant Chain #1 for $1.445 million and the underlying criminal conduct. In particular:

   a.  The Defendant in paragraph 6(a)—$67,344.93 remitted to the United States Marshals Service (USMS) from Chase Account ending in 0852—are funds transferred to the USMS on April 10, 2023 from the initial account where the National Restaurant Chain deposited the entire $1.445 million on January 24, 2023.

   b.  The Defendant in paragraph 6(b)—$54,499.93 remitted to the United States Marshals Service from Chase Account ending in

20

7885—are funds transferred to the USMS on or about May 30, 2023, after the 7885 account received at least $826,358.56 of the $1.445 million from the 0852 account above.

c. The Defendant in paragraph 6(c)—$102,000.00 remitted to the United States Marshals Service from Chase Account ending in 0811—are funds transferred to the USMS on or about May 30, 2023, after the 0811 account received at least $102,000.00 of the $1.445 million from the 0852 account above.

d. The Defendant in paragraph 6(d)—$13,234.43 remitted to the United States Marshals Service from Chase Account ending in 6185—are funds transferred to the USMS on or about May 30, 2023, after the 6185 account received at least $190,000.00 of the $1.445 million from the 0852 account above.

e. The Defendant in paragraph 6(e)—$18,608.89 remitted to the United States Marshals Service from Chase Account ending in 7935—are funds transferred to the USMS on or about May 30, 2023, after the 7935 account received at least $18,608.89 of the $1.445 million from the 0852 account above.

f. The Defendant in paragraph 6(f)—$285,000 remitted to the United States Marshals Service from Chase Account ending in 7893—are

funds transferred to the USMS on or about May 30, 2023, after the

7893 account received at least $285,000 of the $1.445 million from

the 0852 and 7885 accounts above.

g. The Defendant in paragraph 6(g)—All funds on deposit in Horizon

Bank Account ending in 4233, not to exceed $392,663.25—are

funds subject to forfeiture because the 4233 account received at

least $392,663.25 of the $1.445 million from the 7885 account

above.

45.    The Defendant in rem listed in paragraph 6(h) —$200,000.00 remitted

to the United States Marshals Service by check from Chadwell Legal Services—are

funds traceable to the Count 10 cashier's check for $280,000 and the underlying

criminal conduct, because Mr. Kazkaz used those funds to pay $200,000 to Chadwell

Legal Services, and those funds were ultimately remitted to the USMS.

46.    The Defendants in rem listed in paragraph 6(i-j) above are all funds

traceable to the Count 8 cashier's check for $500,000 and the underlying criminal

conduct. In particular:

i.    Defendant in paragraph 6(i) —$80,000.00 remitted to the United

States Marshals Service by Prasad Legal PLLC—represent

repayment of funds from the Count 8 cashier's check that Kazkaz

paid to Prasad Legal PLLC.

22

    j.   Defendant in paragraph 6(j) —$30,000.00 remitted to the United

        States Marshals Service by check from Move Your Feet—

        represent repayment of funds from the Count 8 cashier's check that

        Kazkaz paid to Prasad Legal PLLC, who in turn paid those funds

        to Brian Kischnik and his company Move Your Feet.

## CLAIM FOR RELIEF

46.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 45 above, including any subparagraphs thereunder.

47.    The Defendants *in rem* constitutes proceeds of illegal activity or property traceable to proceeds of illegal activity, as well as property involved in money laundering.  They are therefore subject to civil forfeiture as detailed above and in all related statutes, including 18 U.S.C. § 984, which relates to civil forfeiture of fungible property.

## CONCLUSION

Plaintiff, the United States of America, respectfully requests that warrants for the arrest of the Defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the aforementioned Defendant Currency condemned and forfeited to the United States of America for disposition

according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

        Respectfully submitted,

                Dawn N. Ison
                United States Attorney

                S/K. Craig Welkener
                K. Craig Welkener (DC 1033585)
                Assistant U.S. Attorney
                211 W. Fort Street, Ste. 2001
                Detroit, Michigan 48226
                (313) 226-0248
                Kenton.Welkener@usdoj.gov

Dated: June 8, 2023

## <u>VERIFICATION</u>

I, Todd Fry, am a Special Agent of the Federal Bureau of Investigation (FBI).  I have read the foregoing Complaint for Forfeiture and assert under penalty of perjury that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents.

_____
Special Agent Todd Fry
Federal Bureau of Investigation

Dated: June 8, 2023

25